1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8

9  JOSEPH WELDON SMITH,                    )

10                Petitioner,              )        2:07-CV-00318-JCM-CWH

11  vs.                                    )

12  RENEE BAKER, *et al.*,                 )           **ORDER**

13                Respondents.             )

14  _____ /

15        Before the court for a decision on the merits is an application for a writ of habeas corpus filed

16  by Joseph Weldon Smith, a Nevada prisoner sentenced to death.  ECF No. 40.

17        I.  FACTUAL AND PROCEDURAL HISTORY

18        On December 11, 1992, Smith was convicted of three counts of murder with the use of a

19  deadly weapon, and one count of attempted murder with the use of a deadly weapon.  The convictions

20  were pursuant to jury verdicts in the Eighth Judicial District Court, Clark County, Nevada.  The facts

21  of Smith's case are recounted in Nevada Supreme Court's decision on Smith's initial direct appeal:

22            During the trial Michael Hull, a police officer for the City of Henderson,
          testified as follows:  On Saturday, October 6, 1990, at approximately 2:29 a.m., he was
23        dispatched to the Fountains, a gated community in Henderson.  While on his way, Hull
          was flagged down by a man who subsequently identified himself as Frank Allen.
24        Allen appeared frantic and Hull observed blood on his shirt and blood running down
          the left side of his head.  Allen told Hull that Smith had attacked him with a hammer
25        or a hatchet.

26            After arriving at the Smiths' home, located at 2205 Versailles Court inside the
          gated community, Hull and two other officers observed a large broken window laying

on the front porch outside the house.  Allen had explained to the officers that he had left through that window.  The officers entered the premises and, during a search of a bedroom, observed what appeared to be a figure beneath a blanket.  After lifting the blanket, they discovered a dead body, subsequently identified as twelve-year-old Kristy Cox.  In an adjacent bedroom they discovered a second body, also dead and covered with a blanket, later identified as twenty-year-old Wendy Cox.  Under a blanket in the master bed, the officers found a third victim, Kristy and Wendy's mother and Smith's wife, Judith.

The officers also located some notes written by Smith.  The first, found inside a briefcase in the upstairs den, and dated October 5, 1990, read:

A triple murder was committed here this morning.  My wife, Judith Smith and my two stepdaughters, Wendy Cox and Kristy Cox, were assassinated.  I know who did it.  I know who sent them.  I had been warned that this would happen if I did not pay a large sum of money to certain people.  I have been owing it for a long time and simply could not come up with it.  And I didn't believe the threat.  I don't need any help from the police in this matter.  I will take care of it myself.  They will have to kill me, too.  When and if you find me, I'm sure I will be dead, but that's okay.  I already killed one of the murderers.  And I am going to get the others and the man who I know sent them.  There were three in all.  You will probably find my body within a day or two.

Thank you, Joe Smith.

P.S.: I thought I had gotten away when we moved here, but it didn't work.  When we moved, we were being watched.  If I am successful in my task at hand, I will turn myself into (sic) the police.

The second letter stated, "Frank [Allen], look in the locked room upstairs for your package.  The key is on the wet bar.  Joe."

Dr. Giles Sheldon Green, Chief Medical Examiner for Clark County, testified that he performed the autopsies on the bodies of the three victims.  Green stated that all three victims died from asphyxia due to manual strangulation.  He also opined that the pattern of injuries found on the three victims could have been inflicted with a carpenter's hammer.  On Kristy, Green observed three blunt lacerations to the scalp and a lot of blood in Kristy's hair, some bruising and a scratch on her neck, and substantial hemorrhaging as a result of the trauma to her scalp.

On Wendy, Green observed several "quite ragged, irregular, deep lacerations of the forehead," and at least six or seven wounds of the face.  There were a total of thirty-two head lacerations, some of which were patterned injuries of pairs of penetrating wounds of the scalp tissue.  On the left side of Wendy's head, a large laceration inside the ear almost cut the outer ear in two.  Green found numerous scratches and abrasions on the front of Wendy's neck, as well as defensive wounds, such as a fractured finger, bruises on the backs of her hands and a finger with the skin over the knuckle knocked away.  Green found areas in which the various head impacts had created depressed fractures of the outer and inner surfaces of the skull.  There was

2

also a great deal of hemorrhaging and damage to the soft tissues of Wendy's neck.

On Judith, Green found lacerations of the forehead and above her right eyebrow, abrasions and scratches on the front of her neck and a cluster of at least five lacerations of the scalp, mainly on the right side of the back of the head. It was Green's opinion that the five lacerations were inflicted after death.

Allen testified as follows: He met Smith in September 1990, when Smith came to Allen's home located at 2205 Versailles Court, inside the Fountains, wishing to purchase that home. Although Allen first indicated that the house was not for sale, after Smith agreed to pay $50,000 over the appraised value of $650,000, Allen agreed to sell him the house. Allen subsequently gave Smith the keys to the house, but retained one of the bedrooms for his use when he came to Las Vegas on weekends, until the sale was final. Smith informed Allen that he was in a rush to move into the house because he wanted to make preparations for his step-daughter, Wendy's, wedding in November.

On September 21, 1990, Smith gave Allen a personal check for $35,000 as a good faith deposit. Approximately six days later, the bank notified Allen that the check had been returned because Smith had closed his account. Smith assured Allen that he would mail him a certified check immediately. Two days later, having not received a check, Allen indicated to Smith that he would be coming to Las Vegas on Friday, October 5, 1990, and would pick up the check then.

On Friday morning, Allen received a call from Smith who stated, "I thought you were coming up here this morning." Allen told Smith that he would be coming later in the day. Smith stated that he and his wife were going to California to shop for furniture that day, so they arranged for Smith to leave two checks, the $35,000 deposit check and a $3,338.80 check for the October mortgage payment, behind the wet bar in the house, along with Allen's mail.

Allen arrived at the house between 1:00 a.m. and 1:30 a.m. on Saturday, October 6, 1990, and noticed that the security system was off. He went behind the wet bar to retrieve his mail and found the note from Smith telling him to look in the locked room upstairs for the package. Allen went to that room and, not finding any checks, went into the game room. Although the light was not on in the game room, the area was illuminated by a large chandelier in the hallway.

In the game room, Allen saw Smith crouched in the closet. Smith then jumped out and began to pound Allen in the head with an object, which Allen assumed was a hammer. Allen asked Smith what he was trying to do, but Smith did not say anything. Realizing that Smith was trying to kill him, Allen said, "You're not going to get away with this," and pushed Smith backward and ran down the stairway with Smith pursuing him. Allen tried to figure out the best way to get out of the house, and after realizing that he had locked himself in, ran straight through the full-length, leaded-glass front door. He then got into his car and drove to the guard shack at the entrance to the development and asked the guard to call the police.

Eric Lau, the security guard then on duty at the guard-gated entrance to the Fountains, testified that at approximately 2:30 a.m. on Saturday, October 6, 1990,

3

Allen ran up to the side of the guard house and pounded on the window.  Allen's shirt was covered with blood and he said, "He's after me! He's after me!"  Lau immediately called for help and then saw Smith's Lincoln automobile exit the Fountains, with Smith behind the wheel.

Yolanda Cook, Judith's daughter-in-law, testified that on the morning of Friday, October 5, 1990, at 8:00 a.m., she called the Smiths' house to see if someone could take her son to school.  She spoke with Smith, who told her that he had to go to a meeting and that Judith, Wendy and Kristy had gone shopping for Wendy's wedding.  Between 9:00 a.m. and 3:30 p.m., Yolanda called the Smiths' house three more times, and each time Smith told her that Judith and her daughters were away.

Yolanda further testified that on Saturday, October 6, 1990, at approximately 5:00 a.m., Smith called her and told her of the three murders.  He told her that Allen came into the house and bludgeoned them to death.  Smith requested that she tell all of Judith's other children and then go to the house and get the letters out of his briefcase explaining what happened.  He then told her that he was going to kill himself and hung up the phone.

William Lawrence Cook, one of Judith's sons, testified that Smith had expressed concern and irritation over financial obligations such as Wendy's pending wedding and the new house.  William testified that Smith would often refer to himself as the "Lone Wolf" and say, "I gotta get outta here."  Sometimes Smith would say that he just wanted to go away and live on an island somewhere "around no kind of family or nothing like that."  William also remembered Smith telling him that "the worse thing to f___ up a man was to have a family."  Smith made these statements during a collection of conversations over a period of years.

Smith took the stand on his own behalf and testified as follows:  In 1986 he encountered financial difficulties and agreed to accept a drug dealing opportunity in Los Angeles with an organization.  That same year, Smith moved to Las Vegas and continued working for the organization.  At some point, the organization falsely accused Smith of stealing cocaine and told Smith that he now owed the organization a big debt.  Smith quit working for the organization and in 1989 Gino, a man from the organization, found Smith and reminded him of the debt, saying that "it had to be paid or else they were going to give [him] a fate worse than death."

He resumed working for the organization, and also began to look for a new house in a gated community.  He found the house at the Fountains and arranged payment terms with Allen, which included giving Allen eleven kilograms of cocaine in exchange for the equity in the house.  The eleven kilograms were part of a twenty kilogram shipment which Smith had received from the organization and had decided to keep for himself.  Smith gave Allen ten kilograms of cocaine, worth approximately $200,000, on the same day that he gave Allen the $35,000 check.  He claimed that Allen knew that the check was no good and served only to make the transaction seem legitimate, and said he would not deposit it.

On Thursday, October 4, 1990, Smith left the additional kilogram of cocaine owed Allen in Allen's bathroom sink, upstairs where Allen stayed when he was in town for weekends.  That same day, Smith told the organization that he had sold

4

twenty kilograms of cocaine and was keeping the money because he was "tired of working for peanuts."

Between 2:00 a.m. and 3:00 a.m. on the morning of Friday, October 5, while he was in bed with Judith, he was awakened by a tap on his toe.  He then saw three men standing over his bed, one of whom picked up a hammer Smith had been using the previous night and began slapping it in his hand and asking Smith where the "stuff" was.  Another man, who had a sawed-off shotgun, forced Smith to go into the game room and made him lay down and stay there.  Smith subsequently discovered that his family had been killed.

On Friday, after the murders, he remembered receiving three phone calls from Yolanda.  He stated that "I brushed her off like I had other things to do, a meeting I had to attend . . . I really needed some time to sort this out.  There was too many loose ends that I didn't have answers to."  Smith stated that he did not go to the police because he would have to tell them about the drugs and because it looked like he committed the crime and he knew they would put him in jail.  He stated that he was also trying to figure out if Allen might have been involved in the murders and might have provided the killers with keys to the house.  He called Allen that Friday morning to see if he could find out from Allen's voice if Allen was involved in the murders.  After the phone call, he decided that Allen was not involved.

At approximately 4:00 p.m. on Friday, Smith took some sleeping pills and lay down on the game room floor by the closet.  Early Saturday morning, he awoke to the sounds of someone coming into the game room.  He thought that the killers had returned and began swinging the hammer at a man.  He did not know it was Allen because it was dark and Allen did not say anything during the attack.

Six months after the murders, Smith was arrested in California.  When he was arrested, evidence was seized which indicated that he was attempting to change his identity.  Smith was charged with three counts of murder with use of a deadly weapon and one count of attempted murder with use of a deadly weapon.  He was convicted of all four counts and sentenced to death for the murders of Kristy and Wendy, life without possibility of parole for Judith's murder and to two consecutive twenty-year terms for the attempted murder of Allen with use of a deadly weapon.

*Smith v. State*, 881 P.2d 649, 650-53 (Nev. 1994).

The Nevada Supreme Court affirmed the convictions but vacated the deadly weapon enhancement.  *Id*. at 654.  The state supreme court also vacated the death sentences and remanded for a new punishment trial.  *Id*. at 655-56.

On April 18, 1996, a jury again sentenced Smith to death for the murders of Wendy and Kristy Cox.  On appeal, the Nevada Supreme Court vacated the death sentence as to the murder of Kristy (replacing it with a life sentence without the possibility of parole), but affirmed the death sentence for

the murder of Wendy.  *Smith v. State*, 953 P.2d 264 (Nev. 1998).  The Nevada Supreme Court denied Smith's petition for rehearing and issued its remittitur on March 31, 1998.  On May 20, 1998, Smith was sentenced by the lower court in accordance with the state supreme court's remand.

On August 11, 1998, Smith filed, *pro se*, a state habeas petition in the Eighth Judicial District Court, Clark County.  Having been appointed counsel, he filed an amended petition on September 21, 1999.  On July 15, 2003, he filed supplemental points and authorities in support of his petition.  On January 5, 2005, Smith filed a supplemental brief in support of his petition.  The Eighth Judicial District Court denied relief on April 25, 2005.  Smith appealed.  On September 29, 2006, the Nevada Supreme Court affirmed the lower court  in an unpublished order.  The Nevada Supreme Court denied rehearing on November 29, 2006.

On March 13, 2007, Smith initiated this action by filing, *pro se*, a federal petition for writ of habeas corpus.  ECF No. 1.  Represented by the Federal Public Defender's office (FPD), Smith filed his first amended petition in this court on October 9, 2007.  ECF No. 40.  On February 28, 2008, this court granted a stipulation to stay the proceedings and hold them in abeyance pending Smith's exhaustion of state remedies.  ECF No. 53.

On April 2, 2009, the FPD was relieved as counsel for Smith.  ECF No. 79.  Mario Valencia was appointed as counsel on June 29, 2009.  ECF No. 85.  On February 9, 2011, this court granted Smith's motion to lift the stay and reopen the proceedings.  ECF No. 98.  On April 4, 2011, the State filed a motion to dismiss in which they argued that numerous claims in the petition should be dismissed under the doctrine of procedural default or for failure to state a federal claim for relief. ECF No. 118.  Pursuant to that motion, this court dismissed several claims from the first amended petition.  ECF No. 165.  Claims One, Two, Six through Eight, Ten through Fifteen, and Thirty remain before the court for a decision on the merits.

II. STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  28

1  U.S.C. § 2254(d) sets forth the standard of review under AEDPA:.

2      An application for a writ of habeas corpus on behalf of a person in custody
       pursuant to the judgment of a State court shall not be granted with respect to any claim
3      that was adjudicated on the merits in State court proceedings unless the adjudication of
       the claim –

4
       (1)  resulted in a decision that was contrary to, or involved an unreasonable
5      application of, clearly established Federal law, as determined by the Supreme Court of
       the United States; or
6
       (2)  resulted in a decision that was based on an unreasonable determination of
7      the facts in light of the evidence presented in the State court proceeding.

8  28 U.S.C. § 2254(d).

9      A decision of a state court is "contrary to" clearly established federal law if the state court

10 arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state

11 court decides a case differently than the Supreme Court has on a set of materially indistinguishable

12 facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable application" occurs when

13 "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a

14 prisoner's case." *Id*. at 409.  "[A] federal habeas court may not "issue the writ simply because that

15 court concludes in its independent judgment that the relevant state-court decision applied clearly

16 established federal law erroneously or incorrectly." *Id*. at 411.

17     The Supreme Court has explained that "[a] federal court's collateral review of a state-court

18 decision must be consistent with the respect due state courts in our federal system." *Miller–El v.*

19 *Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for

20 evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

21 doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7

22 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination

23 that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

24 on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)

25 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized

26

7

1   "that even a strong case for relief does not mean the state court's contrary conclusion was

2   unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*,

3   131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly

4   deferential standard for evaluating state-court rulings, which demands that state-court decisions be

5   given the benefit of the doubt") (internal quotation marks and citations omitted).

6        "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

7   adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398.  In *Pinholster*, the Court reasoned

8   that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the

9   state-court decision at the time it was made," and, therefore, the record under review must be "limited

10  to the record in existence at that same time, i.e., the record before the state court." *Id*.

11       For any habeas claim that has not been adjudicated on the merits by the state court, the federal

12  court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. §

13  2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160,

14  1167 (9th Cir. 2002).  *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting that federal

15  court review is *de novo* where a state court does not reach the merits, but instead denies relief based

16  on a procedural bar later held inadequate to foreclose federal habeas review).  In such instances,

17  however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pinholster*, 131 S.Ct at 1401 ("Section

18  2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*,

19  313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1)

20  even if legal review is *de novo*).

21       Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review

22  habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable

23  application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so, however,

24  the Court did not preclude such an approach.  "AEDPA does not require a federal habeas court to

25  adopt any one methodology in deciding the only question that matters under § 2254(d)(1) – whether a

26

1   state court decision is contrary to, or involved an unreasonable application of, clearly established

2   Federal law." *Id.*

3           III.  ANALYSIS OF CLAIMS

4                       **Claims One and Two**

5           In Claim One, Smith contends that his constitutional rights were violated because the Nevada

6   courts lacked jurisdiction to adjudicate the criminal proceeding that resulted in his convictions and

7   sentences.  In Claim Two, he contends that the prosecutors and the Nevada courts failed to follow the

8   relevant state statute that vested the trial court with jurisdiction.  Both of these claims are premised on

9   the factual allegation that the State did not file a criminal complaint prior to Smith's preliminary

10  examination.

11          Smith exhausted the claims by presenting them to the Nevada Supreme Court in his first

12  post-conviction proceeding.  ECF No. 111-12, p. 8-10, 37-38.[1]  In his opening brief, Smith argued

13  that, under state law, the absence of a criminal complaint on file means that the warrant for his arrest

14  was invalid, that the state justice court lacked jurisdiction to conduct a preliminary hearing and bind

15  him over to the district court for trial, and, consequently, that the district court never acquired

16  jurisdiction to adjudicate his case.  ECF No. 111-10, p. 19-25.  In his reply brief, Smith claimed that,

17  due to the state court's lack of jurisdiction, his convictions violate the Fifth, Sixth, and Fourteenth

18  Amendments of the Unites States Constitution.  ECF No. 111-12, p. 8-10.

19          The Nevada Supreme Court denied relief on two grounds.  First, the court held that any

20  challenge to the arrest warrant or the jurisdiction of the justice court should have been raised prior to

21  trial.  ECF No. 111-12, p. 37-38.  Second, the court concluded "that Smith had failed to show that the

22  warrant was infirm or that the justice of the peace who issued it lacked the authority to do so."  *Id*.

23          The absence of a reference to federal law in the Nevada Supreme Court's decision does not

24

25          [1]  Citations to page numbers for electronically filed documents are based on the CM/ECF
    pagination.

26

9

1   necessarily mean that the deferential standards imposed by § 2254(d) do not apply here. *See Richter*,

2   131 S.Ct. at 784.  Even considered *de novo*, however, neither Claim One nor Claim Two is a ground

3   for granting Smith relief.

4          With respect to Claim One, the Nevada Supreme Court was satisfied that the trial court had

5   jurisdiction under Nevada law to adjudicate Smith's case.  As stated by the Supreme Court in *Estelle*

6   *v. McGuire*, 502 U.S. 62 (1991), "it is not the province of a federal habeas court to reexamine state

7   court determinations on state law questions."  502 U.S. at 67-68.  Determinations regarding

8   jurisdiction are not an exception to this general rule. *Poe v. Caspari*, 39 F.3d 204, 207 (8th Cir. 1994);

9   *see also Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir. 1976) ("Determination of whether a state court

10  is vested with jurisdiction under state law is a function of the state courts, not the federal judiciary.").

11         As for Claim Two, a habeas petitioner may not transform a state law issue into a federal one

12  merely by asserting a due process violation. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

13  At a minimum, Smith needs to show that the alleged failure to follow state procedures resulted in the

14  deprivation of a substantive right.  *See Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir. 1994) ("Only the

15  denial or misapplication of state procedures that results in the deprivation of a substantive right will

16  implicate a federally recognized liberty interest.").  While Smith claims that he had "a state-created,

17  constitutionally protected liberty interest in the fair administration of state procedures governing

18  charging and arresting those suspected of committing felonies" (ECF No. 168, p. 59), he fails to

19  explain how the procedures in his case resulted in unfairness.  "Process is not an end in itself;" and

20  "an expectation of receiving process is not, without more, a liberty interest protected by the Due

21  Process Clause." *Olim v. Wakinekona*, 461 U.S. 238, 251 n. 12 (1983).

22         Claims One and Two are denied.

23         **Claim Six**

24         In Claim Six, Smith claims that he was denied his constitutional rights because the trial court

25  failed to inquire into his competence.  According to Smith, the trial court was constitutionally

26

10

1 | required to make a *sua sponte* inquiry into his competence to stand trial after Smith "had an outburst

2 | in the courtroom, threw newspaper articles in the direction of the jury, and refused to further

3 | participate in his trial."  ECF No. 40, p. 50.

4 | In *Pate v. Robinson*, 383 U.S. 375 (1966), the Supreme Court held that, where evidence had

5 | been presented raising a doubt as to defendant's competence to stand trial, the state trial court violated

6 | the defendant's constitutional right to a fair trial by not conducting a hearing on the issue.  *Id*. at 385.

7 | The Ninth Circuit has interpreted *Pate* as requiring a trial judge to conduct a competency hearing

8 | whenever the evidence before him raises a bona fide doubt about the defendant's competence to stand

9 | trial, even if defense counsel does not ask for one.  *See De Kaplany v. Enomoto*, 540 F.2d 975, 979

10 | (9th Cir. 1976) (en banc).  "A bona fide doubt exists if there is substantial evidence of incompetence,

11 | or substantial evidence that the defendant lacks sufficient present ability to consult with his lawyer

12 | with a reasonable degree of rational understanding or a rational as well as factual understanding of the

13 | proceedings against him."  *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir.2004) (internal

14 | quotation marks and citations omitted).

15 | In his first state post-conviction proceeding, Smith argued to the Nevada Supreme Court that

16 | trial counsel was ineffective in failing to request a competency hearing at Smith's trial.  ECF No.

17 | 111-12, p. 12-13.  The Nevada Supreme Court rejected the claim, stating that "[n]othing in the

18 | transcripts or Smith's submissions to this court suggests incompetence or that his counsel should have

19 | questioned his competence."  *Id*., p. 35.

20 | Given that Smith presented the competency issue in the context of alleging ineffective

21 | assistance of counsel, the Nevada Supreme Court understandably did not cite to *Pate*.  Even so, the

22 | state court's factual finding as to the lack of evidence of Smith's alleged incompetence is presumed

23 | correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *see also Davis*

24 | *v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (noting that the state trial and appellate courts' findings

25 | that the evidence did not require a competency hearing under *Pate* are findings of fact to which we

26 |

1 | must defer unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)).

2 |      In *Davis*, the court of appeals concluded that the trial judge did not err in declining to hold a

3 | competency hearing even though the defendant, against counsel's advice, decided to not wear civilian

4 | clothes and to remain in the doorway of the courtroom rather than face the prosecution witnesses.

5 | 384 F.3d at 645-46.  This case is similar in that Smith's conduct in the courtroom, while obviously

6 | inappropriate, was not necessarily a reason for the trial judge to question whether Smith was able to

7 | consult with his lawyer with a reasonable degree of rational understanding or whether he possessed a

8 | rational as well as factual understanding of the proceedings against him.  Accordingly, Smith is not

9 | entitled to relief under Claim Six.

10 |           **Claim Seven**

11 |      In Claim Seven, Smith claims that he was denied his constitutional right to effective assistance

12 | of counsel because his trial counsel did not request a competency hearing prior to Smith's second

13 | penalty phase hearing.  In addition to the outburst mentioned above, other factors Smith points to as

14 | reasons for counsel to request a competency hearing are Smith's refusal to cooperate with new

15 | counsel after his death sentences were reversed, allegations he made that new counsel was involved in

16 | a conspiracy with the state court judge presiding over his second penalty phase hearing, and a lawsuit

17 | he filed against the district attorney.

18 |      In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

19 | prong test for analysis of claims of ineffective assistance of counsel: a petitioner claiming ineffective

20 | assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an

21 | objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the

22 | defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the

23 | result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688, 694.

24 |      As noted above, this claim was presented to, and rejected by, the Nevada Supreme Court in

25 | his first state post-conviction proceeding.  ECF No. 111-12, pp. 12-13, 35.  Smith claims that the

26 |

1  Nevada Supreme Court's decision was an unreasonable application of federal law and was based on

2  an unreasonable determination of the facts in light of evidence presented to the state court, but his

3  supporting argument consists of little more than citing Smith's various actions and asserting either

4  that they "do not reflect a rational understanding of the proceedings" or that they "do not reflect the

5  ability to consult with counsel."  ECF No. 168, p. 49-50.  What is missing is credible evidence that

6  Smith lacked the capacity to either consult with his lawyers with a reasonable degree of rational

7  understanding or understand the nature of the proceedings against him.  *See Godinez v. Moran*, 509

8  U.S. 389, 402 (1993) (noting that the competency requirement "has a modest aim:  It seeks to ensure

9  that [the defendant] has the capacity to understand the proceedings and to assist counsel"); *see also*

10  *Dennis v. Budge*, 378 F.3d 880 (9th Cir. 2004) ("The question . . . is not whether mental illness

11  substantially affects a *decision*, but whether a mental disease, disorder or defect substantially affects

12  the prisoner's *capacity* to appreciate his options and make a rational choice among them.).

13        Even setting aside the limitation on new evidence mandated by *Pinholster*, Smith has not

14  established that he was prejudiced by his counsel's failure to request a competency hearing.  In an

15  attempt to show prejudice, Smith proffers the opinion of Dr. Richard Dudley, a forensic psychiatrist

16  who evaluated Smith in 2007, more than ten years after his second penalty phase hearing.  ECF No.

17  168, p. 50.  Dr. Dudley noted that, despite being extremely bright, Smith exhibited paranoid and

18  grandiose thinking that compromised his decision-making capabilities and judgment.  ECF No. 40-4,

19  p. 248.  He also noted that Smith's paranoid thinking and grandiosity can elevate to the point that

20  Smith "evidences specific paranoid and grandiose delusions."  *Id*.  Nowhere in his report, however,

21  does Dr. Dudley indicate that Smith failed, at any point, to meet the standard for competence to stand

22  trial.  Claim Seven is denied.

23        **Claim Eight**

24        In Claim Eight, Smith challenges the constitutionality of the trial court's instructions to the

25  jury regarding depravity of mind, torture, and mutilation, as an aggravating circumstance.  At Smith's

26

1   second penalty hearing, the only aggravating circumstance alleged by the State as to the murders of

2   Wendy Cox and Kristy Cox was that the murders involved "torture, depravity of mind, or the

3   mutilation of the victim."[2]  Prior to jury deliberation, the trial court determined that there was

4   insufficient evidence to support a finding of torture or mutilation with respect the murder of Kristy

5   and, therefore, eliminated those grounds as a potential aggravating factor.  ECF No. 109-5, p. 34-41.

6   Thus, the jury was instructed as follows:

7       You are instructed that the following factors are circumstances by which Murder of the
        First Degree may be aggravated:

8       The murder involved torture, depravity of mind, or the mutilation of the victim.

9       The State is alleging depravity of mind in the murder of Kristy Cox.

10      The State is alleging torture or depravity of mind or mutilation in the murder of Wendy
        Cox.

11

12   ECF No. 109-6, p. 9.

13       The jury found that the murder of Kristy involved depravity of mind, but the Nevada Supreme

14   Court subsequently concluded that the court's jury instruction defining the term "failed to properly

15   channel the jury's discretion" and vacated the death sentence on that basis.  *Smith*, 953 P.2d at 267.

16   With respect to the murder of Wendy, the jury returned a special verdict form on which it indicated

17   that it had found that the murder had involved both depravity of mind and mutilation.  ECF No. 109-

18   6, p. 28.  Smith argues that the aggravating circumstance with respect to Wendy's murder is

19   constitutionally infirm because the depravity of mind factor is invalid and there is no way to know for

20   sure that the jury was unanimous as to the mutilation factor.

21       This court does not agree.  The trial court instructed the jury that, in order to find depravity of

22   mind, it must find serious and depraved physical abuse beyond the act itself.  *Id*., p. 12.  The Nevada

23   Supreme Court concluded that the instruction was lacking because it did not require a finding of

24

25       [2]  The statute that supplied this aggravating factor,  Nev. Rev. Stat. 200.033(8), was amended in
    1995, deleting the language of "depravity of mind." 1995 Nev. Stat., ch. 467, §§ 1-3, at 1490-91.

26

1    torture or mutilation beyond the act of killing itself. *Smith*, 953 P.3d 267. In both *Ybarra v.*

2    *McDaniel*, 656 F.3d 984, 995 n. 6 (9th Cir. 2011) and *Valerio v. Crawford*, 306 F.3d 742, 752, 762 (9th

3    Cir. 2002), however, the Ninth Circuit accepted that the same instruction in those respective cases

4    was constitutional. Moreover, respondents correctly point out that no federal court has required that,

5    as a matter of federal law, the jury must be unanimous in finding one of the three component parts of

6    the aggravating circumstance – i.e., torture, mutilation, or depravity mind.[3]

7        Even if the Nevada court erred, as a matter of federal law, in instructing the jury on the

8    aggravating circumstance, habeas relief is not warranted because the error was harmless. The

9    appropriate harmless error standard in this context is the one set forth in *Brecht v. Abrahamson*, 507

10   U.S. 619 (1993). *Ybarra*, 656 F.3d at 995; *Valerio*, 306 F.3d at 762. Under *Brecht*, the question is

11   "whether, in light of the record as a whole," the error "had substantial and injurious effect or influence

12   in determining the jury's verdict." *Brecht*, 507 U.S. at 638. Following the approach in *Ybarra* and

13   *Valerio*, this court assesses whether the challenged instructions "had a substantial and injurious effect

14   or influence on the jury's decision to impose the death sentence, in comparison to what its decision

15   would have been had it been instructed on a constitutionally narrowed version of the [aggravating]

16   factor." *Ybarra*, 656 F.3d at 995.

17        Based on the state court record, there is a "fair assurance" (*id*. at 996) that the jury would have

18   imposed the death sentence based on the mutilation factor alone. The jury was instructed that, to find

19   mutilation, it must find that there was mutilation "beyond that act of killing itself" and that "the term

20   'mutilate' means to cut off or permanently destroy a limb or essential part of the body or to cut off or

21   alter radically so as to make imperfect." ECF No. 109-6, p. 12-13. Evidence presented at the second

22

23      [3] Smith's citation to *Stromberg v. California*, 283 U.S. 359 (1931), is unavailing. In that case, the Supreme Court set aside a conviction arising from a jury verdict that did not specify which of three

24   clauses in a criminal statute it rested upon and one of those clauses was indisputably invalid under the Federal Constitution. 283 U.S. at 368-69. Here, the jury did specify which grounds it relied upon to find

25   the aggravating circumstance; and, Smith has not established that either is unconstitutional.

26

1   penalty hearing established that strangulation was the cause of Wendy's death.    ECF No. 109-4, p.

2   25.  If further established Smith struck Wendy in the head with a claw hammer at least 16 times prior

3   to strangling her, that her skull was fractured in several places, and that her ear was nearly cut in two.

4   *Id*., pp. 21-30, 39-40.

5         Given that the jury was instructed that it must be unanimous in its finding as to the

6   aggravating circumstance, the special verdict form, on which depravity of mind and mutilation were

7   individually checkmarked, is a strong indication that all the jurors found that the murder involved

8   mutilation.  ECF No. 109-6, pp. 16; 28.  Moreover, it is almost certain that, even with the depravity of

9   mind factor stripped away, the jury would have nonetheless imposed the death sentence inasmuch as a

10  finding of mutilation subsumes or exceeds in gravity a finding of "serious and depraved physical

11  abuse."  *See Smith*, 953 P.3d at 267 (noting that the trial judge "may have implicitly decided that

12  'serious and depraved physical abuse' involved less physical abuse than torture or mutilation").

13  Smith is not entitled to habeas relief based on Claim Eight.

14         **Claim Ten**

15         In Claim Ten, Smith claims that his constitutional rights were violated by virtue of the trial

16  court's jury instruction on mutilation as an aggravating circumstance and the fact that no rational juror

17  could have found mutilation beyond the act of killing itself.  According to Smith, the jury instruction

18  defining mutilation (discussed above) is overbroad because it does not include and element of intent

19  and, under the definition, "every murderer is death eligible because every murderer has rendered his

20  victim's body imperfect."  ECF No. 168, p. 31.

21         In *Godfrey v. Georgia*, the Supreme Court considered an aggravating circumstance instruction

22  that allowed for the death penalty if the jury found that the murder was "'outrageously or wantonly

23  vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the

24  victim.'"  446 U.S. 420, 422 (1980) (quoting Georgia statute).  The Court held that the instruction

25  was unconstitutional *as applied in that case* because it resulted in "standardless and unchanneled

26

16

imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Id.* at 429.  The Court further held that the Georgia Supreme Court failed to cure the defect because it did not apply a constitutional construction of the statutory language in affirming the death sentences on appeal. *Id.* at 432-33.

As explained in *Tuilaepa v. California*, the Supreme Court has found very few aggravating factors to be impermissibly vague and all of those have been similar to each other.  512 U.S. 967, 973-74 (1994) (citing to *Godfrey* and *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1988) as examples, the latter of which addressed an aggravating circumstance that asked whether the murder was "especially heinous, atrocious, or cruel").[4]  An aggravating factor withstands a constitutional challenge if it has some "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id.* at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976)).  However, to be constitutional, an aggravating circumstance must "not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa*, 512 U.S. at 972; *see also Arave v. Creech*, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.").

In deciding this claim on appeal from Smith's second penalty hearing, Nevada Supreme Court stated:

> Smith contends that the jury instruction regarding mutilation was unconstitutionally vague and ambiguous.  Smith further contends that because the medical examiner testified that Wendy's external injuries occurred at about the same time as her death and that the blows to her head could have rendered her unconscious, torture or mutilation could not be proved beyond a reasonable doubt.

---

[4]  Though *Tuilaeapa* was decided nearly 20 years ago, this state of affairs still applies today.  In the rare instances since *Tuilaeapa* where the Court has found an aggravator invalid on vagueness grounds, the aggravator has consisted of pejorative adjectives that generally apply to all murders.  *See, e.g.*, *Barber v. Tennessee*, 513 U.S. 1184 (1995) (mem.) (denying certiorari on other grounds, but noting "wicked or morally corrupt" as an aggravator is "plainly impermissible" because such a state of mind is characteristic of every murder).

17

1
2
3

> The jury was instructed "that the term mutilate means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect."  This court upheld this definition of mutilation in *Deutscher v. State*, 95 Nev. 669, 677, 601 P.2d 407, 412–13 (1979), *vacated on other grounds*, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991).

4
5
6

> We conclude that the jury instructions regarding mutilation were constitutionally sound.  We further conclude that there was sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that the murder of Wendy involved mutilation.

7  *Smith*, 953 P.2d at 267-68.

8    As noted above, the jury was instructed that, to find mutilation, it must find that there was

9  mutilation "beyond that act of killing itself" and that "the term 'mutilate' means to cut off or

10  permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make

11  imperfect."  ECF No. 109-6, p. 12-13.  This instruction provides a "common sense core of meaning"

12  that a jury should be able to understand.  Moreover, the Ninth Circuit Court of Appeals addressed the

13  same definition of mutilation in *Deutscher v. Whitley*, and concluded that it was "sufficiently clear

14  and objective to satisfy the requirements of *Godfrey*."  884 F.2d 1152, 1162 (9th Cir. 1989).  In

15  particular, the court of appeals noted that "[t]he cutting off or destruction of a portion of the body

16  (mutilation) is an objective difference between a murder by mutilation and any other murder."  *Id*.

17    As for Smith's claim about the sufficiency of the evidence, the standard used by the federal

18  habeas court to determine whether a state court finding of an aggravating circumstance is supported

19  by sufficient evidence is the same "rational factfinder" standard established in *Jackson v. Virginia*,

20  443 U.S. 307 (1979), to test whether sufficient evidence supports a state conviction.  *Lewis v. Jeffers*,

21  497 U.S. 764, 781 (1990).  Under that standard, the court inquires as to "whether, after viewing the

22  evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

23  essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319 (citation

24  omitted).

25    The evidence discussed above in relation to Claim Eight was sufficient for a rational jury to

26

18

find beyond a reasonable doubt that Smith's murder of Wendy Cox involved mutilation as defined by the jury instruction. Thus, Smith is not entitled to habeas relief under the *Jackson* standard, especially in light of the extra layer of deference imposed by AEDPA. *See Boyer v. Belleque*, 659 F.3d 957, 964 -65 (9th Cir. 2011) (noting that "the state court's application of the *Jackson* standard must be 'objectively unreasonable' to warrant habeas relief for a state prisoner). Claim Ten is denied.

**Claim Eleven**.

In Claim Eleven, Smith claims that his death sentence is in violation of his rights under the Sixth Amendment because the trial court erroneously denied his request to represent himself at his second penalty hearing. After his death sentences were set aside in his first direct appeal, the trial court granted Smith's request to represent himself with the county public defender acting as stand-by counsel. Several months later, however, the court rejected Smith's renewed request for self-representation based, in part, on a finding that he was attempting to "toy with the courts." ECF No. 107-10, p. 43-46. Smith argues that there was insufficient evidence to support the trial court's decision.

A criminal defendant has a Sixth Amendment right to self-representation. *Faretta v. California*, 422 U.S. 806, 819–20 (1975). A defendant's decision to represent himself and waive the right to counsel, however, must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay. *Id*. at 835; *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994). A defendant must be allowed to exercise his right to self-representation so long as he knowingly and intelligently waives his right to counsel and is "able and willing to abide by rules of procedure and courtroom protocol." *See McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). "[A] trial court may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n. 46.

On July 25, 1995, less than two weeks before the scheduled date for the penalty hearing to begin and a more than two months after the trial court ordered that Smith would be permitted to

represent himself with the county public defender acting as stand-by counsel, Smith filed a petition for post-conviction relief in the trial court claiming that the county public defender had provided ineffective assistance of counsel at his first trial.  ECF No. 107-9, p. 26-39.  A few days later, he also filed a motion to hold his penalty hearing in abeyance pending the outcome of his post-conviction petition.  *Id.*, p. 40-43.  However, at a status hearing held on August 1, 1995, Smith did not mention either filing. *Id.*, p. 44-47.

On August 3, 1995, the court held another status hearing, apparently prompted by Smith having set a hearing on his petition for the following Tuesday, a day after his penalty hearing was set to begin.  ECF No. 107-10, p. 1-11.  At that status hearing, the court discussed the conflicts – in terms of both scheduling and stand-by representation by the county public defender – occasioned by Smith's filings.  *Id.*  Smith indicated that he had spoken with Donald York Evans, an attorney in Reno, about representation and proposed that the court appoint him as counsel.  *Id.*, p. 8.  The court vacated the date set for the penalty hearing to allow Smith to make arrangements with Evans.  *Id.*, p. 10.

The court held a status hearing on August 17, 1995, at which the trial court confirmed that Evans would represent Smith at the penalty hearing as lead counsel and that the state public defender (a different office than the county public defender) would assist as second chair.  *Id.*, p. 25-28.  Smith agreed to this arrangement.  *Id.*  The court set the penalty hearing for April 15, 1996.  *Id.*

In early September, Smith filed a motion to discharge counsel and to allow Smith to represent himself.  *Id.*, p. 33-36.  At a hearing on October 17, 1995, the trial court stated as follows:

> Okay.  Mr. Smith, really, the only way to not allow somebody to represent themselves is a finding that either it's going to delay things, or that the defendant is playing with the system.
>
> My feeling is, really, for two reasons:  I'm not satisfied that a waiver of counsel in this case should be granted to you.
>
> One:  you showed during the trial, an absolute disrespect for the orderly processes of the Court by standing up and dropping into the jury box things you wanted them to see which included your offer to take a lie detector test.
>
> Secondly:  during the trial, after that didn't work and I guess they didn't read

1    them, you just refused to be cross examined at any point after that.

2          Despite that, I'd let you waive counsel and get stand-by counsel.  And on the
     very eve of trial when we had everything set up, you concocted a way to get that
3    counsel off the case.

4          I don't think you can toy with the courts the way I believe you are attempting to
     do so and I'm going to deny your motion to terminate counsel.  Mr. Evans and the State
5    Public Defender will continue to represent you.

6    *Id.*, p. 43-46.

7          In addressing Smith's claim of a *Faretta* violation on direct appeal, the Nevada Supreme

8    Court stated as follows:

9          Smith argues that the trial judge committed reversible error in denying his
     constitutional right to represent himself at the second penalty hearing.  Smith argues
10   that he was forced to proceed with court-appointed counsel whom he had clearly
     rejected and with whom he refused to cooperate.

11
          A defendant has an "unqualified right" to self representation provided he has
12   made a voluntary and intelligent waiver of the right to counsel.  *Lyons v. State*, 106
     Nev. 438, 443, 796 P.2d 210, 213 (1990).  However, self representation may be denied
13   where the defendant abuses the right of self representation by disrupting the judicial
     process.  *Id*. at 443–44, 796 P.2d at 213.

14
          At the hearing on Smith's motion to waive counsel, the trial judge noted that
15   Smith had engaged in several disruptive acts during trial.  Additionally, the trial judge
     believed Smith had dilatory purposes when he moved to waive counsel.  We conclude
16   that the trial judge did not abuse his discretion when he denied Smith's motion to
     waive counsel.

17

18   *Smith*, 953 P.2d at 268.

19         The trial court accepted Smith's waiver of counsel after Smith assured the court that he would

20   not disrupt proceedings as he had done at his initial trial.[5]  ECF No. 107-9, p. 11-12.  The court was

21   understandably skeptical of Smith's motives when he filed his petition for post-conviction relief

22   shortly before the scheduled date for his penalty hearing, then asked the court to appoint Evans:

23         . . . I think this is so calculated what you are doing now.  I've never seen you
     do anything that wasn't calculated.  And I think this is calculated to do exactly what
24

25         [5]  In asking for this assurance, the trial court referred the episode in which Smith left the witness
     and dropped newspaper clippings in the jury box, then refused further questioning from the prosecutor.
26

1    we're doing which is vacate this hearing.  Now, we're only doing this once.  And I
    want to get this over in not only an expeditious fashion, but in a fashion where there is
2    some finality.

3  ECF No. 107-10, p. 9.  So, when Smith moved to discharge counsel a few weeks after agreeing to the

4  court's appointment of Evans, the court had sufficient grounds to find that Smith was attempting to

5  "toy with the courts."  As such, this court is satisfied that, under 28 U.S.C. § 2254(d), the finding was

6  not "based on an unreasonable determination of the facts in light of the evidence presented in the state

7  court proceeding."

8        Moreover, the Nevada Supreme Court applied a standard that comports with *Faretta* in

9  concluding that Smith was not denied his right to self-representation under the Sixth Amendment.

10  The court's denial of Smith's claim was not contrary to, or an unreasonable application of, clearly

11  established federal law.  Therefore, Claim Eleven shall be denied.

12       **Claim Twelve**

13        In Claim Twelve, Smith claims that his constitutional rights were violated when his trial

14  counsel refused to testify on his behalf.  Smith argues that his counsel should have testified at trial to

15  rebut the implication that he had "concocted his testimony with counsel."  ECF No. 40, p. 67.

16        In cross-examining Smith at trial, the prosecutor asked a series of questions suggesting that

17  Smith's lengthy pre-trial incarceration had given him the opportunity to prepare his testimony,

18  perhaps with the assistance of counsel.  ECF No. 105-8, p. 16-20.  The court granted defense

19  counsel's request to approach the bench, whereupon counsel and the court discussed whether the

20  prosecutor's line of questioning was appropriate.  *Id.*, p. 17-27.

21        During that discussion, the following exchange took place:

22       THE COURT:  Well, I think what it goes to is possible bias.  I don't see how it
     really prejudices him to ask those questions.
23

24       MR. MARTIN:  Well I think that it just highlights that.  [The prosecutor's]
     going to argue, as I may as well, he knows what he faces.  It's obvious to the jury that
     my defendant has an interest in the outcome, that's part of the system.  I think this just
25    highlights that, it just highlights any argument that now he's going to make.  Well, he's
     had all this time to prepare his testimony.

26

1         It puts us in a bind, Mr. Baker, Mr. Dahl and myself, having worked with Joseph Smith for a year and a half, now we are potential witnesses.  We could be

2    called to testify, and rightfully so, that from the time we first met him until today his story has never changed.

3
          THE COURT:  And I don't think that that's inappropriate.

4
          MR. MARTIN:  And we may need to do that.  How do we do that when we're

5    sitting here as his counsel, now we are potential witnesses.  And I think we're in a bind that's--something that's hard for us to get out of.

6

7    *Id.*, p. 25.

8         Although the court was willing to allow counsel to testify, counsel insisted that the more

9    appropriate course was for the court to grant a mistrial and allow counsel to withdraw.  ECF No. 106-

10   3, p. 3-37.  At one point, defense counsel Stephen Dahl stated:

11        . . . To be candid with the Court, no matter what your ruling is, we won't testify at this trial.  And I think the case law I've provided will explain why as

12   attorneys who are involved in representing somebody cannot be put in a position of a witness for a number of reasons including problems that the jury might perceive,

13   problems of arguing your own credibility.  That fact that if we testify and the jury, for some reason, takes offense to that, for whatever reason, we've still got to argue the

14   guilt phase, plus put on a penalty phase.

15        So, no matter what the Court's ruling is, we will not be testifying.  We think that we should be allowed to withdraw, that other counsel should be appointed for

16   another trial.  And that counsel, new counsel can make the assessment of waiving attorney/client privilege, what would be in the best interest of Mr. Smith under the

17   circumstances rather than us, who would be involved as witnesses, making that determination.

18

19   *Id.*, p. 6.

20        In ruling upon the respondents' motion to dismiss Claim Twelve, this court concluded that

21   this claim was not procedurally defaulted because it was fairly presented to the Nevada Supreme

22   Court in Smith's first state post-conviction proceeding.  ECF No. 162, p. 10.  Having again reviewed

23   the state court record in relation to the claim, the court now recognizes that that conclusion was

24   erroneous – i.e, the claim was presented for the first time in Smith's second post-conviction

25

26

1    proceeding and is, therefore, procedurally defaulted.[6]  *See id.*, p. 4-10.  In any case, the claim fails

2    because Smith cannot meet either prong of the *Strickland* test.

3            The record shows that counsel made a reasoned tactical decision to not testify.  As such,

4    *Strickland* establishes a deferential presumption that the decision was reasonable.  *Strickland*, 466

5    U.S. at 690–9.  While Smith argues that "no valid strategic justification" supported counsel's choice

6    (ECF No. 168, p. 37-41), counsel's concern about the perception it would create for the jury is

7    sufficient to support a finding that counsel's performance was within the range of reasonable

8    competence, especially given the possibility that counsel had undisclosed reasons to believe that their

9    testimony could be harmful to Smith's defense.  *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)

10   (noting the presumption of competence "has particular force where a petitioner bases his

11   ineffective-assistance claim solely on the trial record").

12           Moreover, Smith falls well short of establishing that he suffered *Strickland*-level prejudice as

13   a result of counsel's decision to not testify.  Evidence presented by the State at trial was far more

14   damaging to Smith's credibility than the prosecutor's questions suggesting Smith prepared his

15   testimony while waiting for trial in jail.  For example, the State introduced a letter dated October 9,

16   1990, that Smith sent to Judith Smith's son, Jeffrey Cook, in which he related an elaborate story about

17   the murders and the circumstances leading up to them.  ECF No. 104-4, p. 31-35, 45-50.  That version

18   of events differed significantly from the version Smith gave in his testimony at trial (ECF No. 105-7,

19   p. 9-43) and from the version Smith related to Cook in a telephone conversation on October 11, 1990

20   (ECF No. 104-4, p. 11-21).  Testimony from defense counsel that Smith had consistently told them

21   the same story would not have added appreciable weight to Smith's credibility in the eyes of the jury

22   and, as such, would not have created a reasonable probability of a more favorable outcome to Smith's

23   ───────────────

24           [6]  The claim presented to the state court was a Sixth Amendment violation based on the
     allegation that trial counsel did not withdraw despite an actual conflict of interest arising from their
     position as witnesses.  ECF No. 111-10, p. 31-33; ECF No. 111-12, p. 36-37.  This is the factual basis

25   for Claim Thirteen, discussed below, and a fundamentally different factual theory than that advanced
     in support of Claim Twelve.

26

1  trial.

2      Claim Twelve is denied.

3          **Claim Thirteen**

4      In Claim Thirteen, Smith claims that he was deprived of effective assistance of counsel

5  because counsel's decision to not testify was infected by an actual conflict of interest.  He argues that

6  counsel were placed in a position of choosing between Smith's interest in having counsel testify and

7  their own interests in "not violating what [they] believed to be the rules of ethics, not losing

8  credibility, and not feeling uncomfortable."  ECF No. 168, p. 43.  He further argues that this conflict

9  adversely affected counsel's representation and, therefore, he is not required to show prejudice in

10 order to obtain relief.  *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980)).

11     Smith presented this claim to the Nevada Supreme Court in his first state post-conviction

12 proceeding.   ECF No. 111-10, p. 31-33.   The court rejected the claim on the ground that Smith

13 "failed to make specific allegations that indicate an actual conflict arose."  ECF No. 111-12, p. 35.

14     The problem for Smith is that no U.S. Supreme Court case has recognized a meritorious Sixth

15 Amendment claim based on a claim of conflict of interest due to counsel refusing to testify on a

16 defendant's behalf.  When no Supreme Court precedent controls the legal issue raised by a habeas

17 petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application

18 of, clearly established federal law.  *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008); *see also*

19 *Carey v. Musladin*, 549 U.S. 70, 76–77 (2006).  The Ninth Circuit Court of Appeals' decision in

20 *Foote v. Del Papa*, 492 F.3d 1026 (2007), confirms that AEDPA forecloses habeas relief in this

21 instance.

22     Claim Thirteen is denied.

23          **Claim Fourteen**

24     In Claim Fourteen, Smith claims that his rights to due process and fundamental fairness were

25 violated by virtue of comments made by the prosecutor during closing argument at his second penalty

26

25

1  trial.[7]  The allegedly improper argument that serves as the basis for Claim Fourteen consists of the

2  following:

>   It has been said that evil is easy and has infinite forms.  This case supports that
>   statement.  In this case evil was as easy as picking up a carpenter hammer, using a pair
>   of hands guided by a mind set which was in reckless disregard of consequence or
>   social duty.
>
>   This case profiles a family tragedy. . . . This case also profiles certain evil
>   violent, and murderous acts.  During the early morning hours of Friday, October the
>   5th, 1990, an evil assailant stalked forty-seven-year-old Judith Ruth Smith, twenty
>   year- old Wendy Cox, and twelve-year old Kristy Cox in their bedrooms as they slept.
>
>   . . . .
>
>   When you use a hammer on a twelve-year old, is that prompted by someone
>   with an immoral sense, with no rectitude?  Is that evil?

11  ECF No. 152, p. 27 (excerpts are located at ECF No. 109-7, p. 27-28, 34).

12  When considered within the context of the evidence presented at trial, these remarks are not

13  necessarily objectionable, let alone grounds for habeas relief.  *See Fields v. Woodford*, 309 F.3d 1095,

14  1109, *amended* 315 F.3d 1062 (9th Cir. 2002) (holding that relief will be granted when prosecutorial

15  misconduct amounts to constitutional error, and such error is not harmless).  During closing

16  argument, the prosecutor is permitted to argue reasonable inferences based on the evidence.  *United*

17  *States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  The prosecutor is "allowed to strike hard blows

18  based upon the testimony and its inferences."  *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir.

19  1972); *see also United States v. Bracy*, 67 F.3d 1421, 1431 (9th Cir. 1995) (upholding statement that

20  the defendant was an "imminent source of evil in this courtroom—at this moment").  While Smith

21  claims that they were "inflammatory" and intended "to inspire personal contempt" for him, the

22  prosecutor's remarks were an accurate description of Smith's acts and inferences arising therefrom,

23  based on evidence presented at trial.  Thus, Smith is not entitled to relief based on Claim Fourteen.

---

[7]  The portion of Claim Fourteen in which Smith's alleges that he was deprived of effective assistance of counsel as a result of counsel's failure to object to the prosecutor's misconduct during closing arguments has been dismissed as procedurally defaulted.  ECF No. 162, p. 10.

1           **Claim Fifteen**

2           In Claim Fifteen, Smith claims his constitutional rights were violated because the prosecutor

3   used Smith's invocation of his right to counsel against him during cross-examination.  More

4   specifically, Smith argues that the prosecutor's questions were intended to suggest that Smith's

5   testimony could not be believed because he invoked his right to counsel.  Here again, Smith is

6   referring to the series of questions about Smith conferring with counsel during his pre-trial

7   incarceration, which, according to Smith, implied that he concocted his testimony with the assistance

8   of counsel.  ECF No. 105-8, p. 16-20.

9           Smith contends that he is entitled to relief under *Griffin v. California*, 380 U.S. 609 (1965),

10  and *Doyle v. Ohio*, 426 U.S. 610 (1976).  In *Griffin*, the Court held that that the trial court's and the

11  prosecutor's comments on the defendant's failure to testify violated the self-incrimination clause of the

12  Fifth Amendment.  380 U.S. at 614.  The Court held in *Doyle* that the prosecution may not impeach a

13  defendant with his post- *Miranda* warnings silence because those warnings carry an implicit

14  "assurance that silence will carry no penalty."  426 U.S. at 618.  Though *Griffin* and *Doyle* both

15  involved a defendant's Fifth Amendment right against self-incrimination, Smith argues that the

16  principles established in those cases extend to the prosecutor's comments regarding Smith's

17  invocation of his Sixth Amendment right to counsel.

18          To support such an extension, he cites to several cases from other circuits – *United States ex*

19  *rel. Macon v. Yeager*, 476 F.2d 613 (3rd Cir. 1973); *Marshall v. Hendricks*, 307 F.3d 36 (3rd Cir.

20  2002); *United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980); and *Zemina v. Solem*, 573 F.2d 1027

21  (8th Cir. 1978).  In each of those cases, the comments at issue were made in an effort to suggest that

22  defendant's retention of counsel was an indication of guilt.  *See Macon*, 476 F.2d at 614 (prosecutor

23  argued that defendant's actions immediately after the commission of the crime, including his hiring of

24  an attorney, were inconsistent with his claim of innocence); *Marshall*, 307 F.3d at 71-72 (in cross-

25  examining defendant's sister, prosecutor suggested that it was unreasonable for defendant to hire a

26

                                                    27

1   lawyer if he was innocent of the murder of his wife); *McDonald*, 620 F.2d at 562 (prosecutor argued

2   that guilt could be inferred from the presence of defendant's attorney during the search of defendant's

3   home); *Zemina*, 573 F.2d at 1028 (prosecutor suggested in closing argument that Zemina's phone call

4   to his attorney after his arrest indicated his guilt).

5        The court in *McDonald* recognized a distinction between comments "that 'strike at the

6   jugular' of a defendant's story and those dealing only tangentially with it."  620 F.2d at 563.  Only

7   comments on a defendant's exercise of his right to counsel that fall into the former category will result

8   in a *Doyle*-type constitutional violation.  *Id.*

9        Here, after the prosecutor asked Smith several questions about being incarcerated, the

10  following exchange took place:

11       Q.   You're represented by able attorneys.  Have you conferred with them throughout these
             proceedings?
12
         A.   Yes, I have, sir.
13
         Q.   Are you fully advised as we sit here in the courtroom this morning regarding the
14            potential punishment –

15       A.   Yes, I am.

16       Q.   – that you may receive if convicted for murder of the first degree?

17       A.   Yes, sir, but I don't expect to be convicted.

18       Q.   My question was, sir, have you been fully advised –

19       A.   My answer is "yes," sir.

20       Q.   – of the punishment you may receive?

21       A.   Yes.

22       Q.   What have you been told?

23       A.   I've been told that you filed for the death penalty on me, sir, if I'm convicted.

24       Q.   So you understand that first degree murder carries the potential of capital punishment?

25       A.   Yes, I do.

26

28

1 │ ECF No. 105-8, p. 18.

2 │ Then, after the prosecutor asked Smith more questions about the possible sentences he faced if

3 │ convicted, the cross-examination continued as follows:

4 │       Q.      So, you certainly have a great interest in how this case comes out, don't you?

5 │       A.      Yes, I do, a great interest.

6 │       Q.      Has that great interest caused you to reflect considerably during the months you spent
in the Clark County Detention Center about what you should say on the day when you

7 │                      assumed the witness stand?

8 │       A.      All I decided to say is the truth, sir.

9 │ *Id.*, p. 20.

10 │      Far from striking "at the jugular of defendant's story," the prosecutor's comments about Smith

11 │ consulting with counsel were designed to demonstrate that Smith had been advised of the possible

12 │ sentences that could result if convicted of first degree murder.  The intent of the comments was to

13 │ establish bias, not to suggest Smith was guilty because he exercised his right to counsel.  Thus, the

14 │ prosecutor's comments did not burden Smith's constitutional right to counsel.  Claim Fifteen is

15 │ denied.

16 │ **Claim Thirty**

17 │      In Claim Thirty, Smith asserts that he is entitled to relief because of cumulative error.  Under

18 │ Ninth Circuit precedent, habeas relief may be available based on the aggregate effect of multiple

19 │ errors even though the errors considered in isolation do not rise to the level of a constitutional

20 │ violation.  *See Davis*, 384 F.3d at 654.  "[C]umulative error warrants habeas relief only where the

21 │ errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due

22 │ process.'"  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Donnelly v. DeChristoforo*,

23 │ 416 U.S. 637, 643 (1974)).

24 │      As set forth herein, Smith's claims of error are, for the most part, without merit.  In addition,

25 │ the varied nature of his alleged errors does not lend itself to a conclusion of cumulative prejudice.

26 │

1   The evidence establishing Smith's guilt was overwhelming and incontrovertible, thus the cumulative

2   impact of any errors occurring in that portion of the trial falls well short of rendering it fundamentally

3   unfair.

4        With respect to the penalty phase, the prejudice arising from the allegedly defective jury

5   instructions is addressed above and found wanting as a ground for relief.  And, for reasons discussed

6   above, the challenged portion of the prosecutor's closing argument did not arise to the level of

7   prosecutorial misconduct.

8        Claim Thirty is denied.

9        IV.  MOTION FOR EVIDENTIARY HEARING

10       Smith asks this court to grant him an evidentiary hearing not only as to the merits of claims in

11   his petition (specifically, Claims Seven and Twelve), but also to demonstrate that the failure to

12   develop the factual bases of his claims in state court was due to ineffective post-conviction counsel.

13   ECF No. 169.

14       After *Pinholster*, an evidentiary hearing is pointless once this court has determined that §

15   2254(d) precludes habeas relief.  *See Pinholster*, 131 S. Ct. at 1411 n. 20 ("Because Pinholster has

16   failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a

17   decision 'contrary to' or 'involv[ing] an unreasonable application' of federal law, a writ of habeas

18   corpus 'shall not be granted' and our analysis is at an end."); *see, also*, *Sully v. Ayers*, 725 F.3d 1057,

19   1075-76 (9th Cir. 2013) (holding that lower court did not abuse its discretion in denying an evidentiary

20   hearing on ineffective assistance claims that had been adjudicated in state court).

21       As noted above, the Nevada Supreme Court addressed Claim Seven on the merits and rejected

22   it.  This court has concluded that § 2254(d) bars relief, so, under *Pinholster*, an evidentiary hearing

23   would not serve any purpose with respect to that claim.  Beyond that, the court has considered the

24   evidence Smith relies upon to establish prejudice under *Strickland* (the opinion of Dr. Dudley

25   discussed above) and finds that, even taken at face value, it falls short of meeting the *Strickland*

26

1  standard.

2        For reasons discussed above, Claim Twelve was not adjudicated on the merits by the Nevada

3  Supreme Court, but, instead, was procedurally defaulted.  As such, *Pinholster* does not bar

4  consideration of new evidence with respect to the claim.  In addition, Smith argues that he is allowed

5  to bypass the restrictions on evidentiary hearings imposed by 28 U.S.C. § 2254(e)(2) because his

6  failure to develop the factual bases for the claim in state court was due ineffective assistance of post-

7  conviction counsel.

8        Setting aside whether a hearing is barred by § 2254(e)(2), Smith has not cited to any additional

9  relevant evidence that he intends to present in support of Claim Twelve.  As discussed above, the

10  reasons for counsel's actions are set forth in the existing record and, even if counsel had testified in

11  the manner Smith claims they would have, it would not have resulted in a more favorable outcome to

12  his trial.  Because he has not demonstrated that an evidentiary hearing would assist him in showing

13  that he is entitled to relief, his motion for an evidentiary hearing shall be denied.  *See Schriro v.*

14  *Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal

15  court must consider whether such a hearing could enable an applicant to prove the petition's factual

16  allegations, which, if true, would entitle the applicant to federal habeas relief.") (citation omitted).

17       V.  CONCLUSION

18        For the reasons set forth above, Smith is not entitled to habeas relief.

19                   *Certificate of Appealability*

20        This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing

21  Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).

22  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the

23  issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

24  2002).

25        Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

26

substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

Having reviewed its determinations and rulings in adjudicating Smith's petition, the court finds that none of those rulings meets the *Slack* standard.  The court therefore declines to issue a certificate of appealability for its resolution of any procedural issues or any of Smith's habeas claims.

**IT IS THEREFORE ORDERED** that petitioner's first amended petition for writ of habeas corpus (ECF No. 40) is DENIED.  The clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that petitioner's motion for evidentiary hearing (ECF No. 169) is DENIED.

**IT IS FURTHER ORDERED** that a certificate of appealability is DENIED.

DATED:  March 13, 2014.


UNITED STATES DISTRICT JUDGE

32